NEW ORLEANS SHIPWRIGHT CO., LTD., PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 228, 876, 5111.   Decided November 11, 1926.

The petitioner during the years in question was not a personal service corporation as defined by section 200 of the Revenue Acts of 1918 and 1921.

*Isom J. Guillory, Esq.*, and *E. Barrett Prettyman, Esq.*, for the petitioner.

*J. Arthur Adams, Esq.*, for the respondent.

These are proceedings for the redetermination of deficiencies for the following years in the following amounts:

| | |
|---|---|
| 1918 | $41, 512. 60 |
| 1920 | Over $10, 000. 00 |
| 1921 | 8, 250. 67 |

For the hearing and decision the proceedings were consolidated by agreement of counsel. The single question is whether or not the petitioner was a personal service corporation during the years in question.

### FINDINGS OF FACT.

The petitioner was incorporated in 1902 under the laws of the State of Louisiana and has since conducted its business in the City of New Orleans. Its capital stock consists of 51 shares, each of the par value of $100, a total of $5,100. This was $100 more than the minimum required under the Louisiana laws and was fixed at this amount so that it would be divisible by three. The shares have always been owned as follows:

| Owner. | Number of shares. |
|---|---|
| Alfred LeBlanc | 17 |
| Robert A. Warriner | 8½ |
| Matthew Warriner | 8½ |
| M. J. Sanders | 9 |
| Edward Nathan | 8 |

LeBlanc was the agent in New Orleans of the Harrison Lines, the Warriners were agents there for the Elder-Dempster Lines, and Sanders was agent for the Leyland Lines. All of the stockholders resided in New Orleans at all times material hereto, except Matthew Warriner, brother and partner of Robert, who resided in England.

In 1902, these New Orleans agents of the three English steamship lines above named, with the approval of their principals, incorporated the petitioner to do the shipwright work on the vessels of their respective lines loading at New Orleans, thus to avoid having

the work done by the man who had previously contracted for it at what the agents considered were exorbitant rates. The petitioner performed the work on the basis of cost plus 10 per cent. Cost included the amount paid for materials, labor, superintendence, and all overhead expenses. Later the 10 per cent was increased to 15 per cent.

The shipwright work consisted of the construction of stalls, shifting boards, platforms and the like to protect the ship and cargo. It differed for each ship and for each cargo, but in every instance it had to conform with detailed, printed rules of the New York Board of Underwriters and had to be approved by an inspector of that board before the cargo would be insured.

Prior to 1902, the agent for the owner of any ship which loaded at the port of New Orleans booked and made all necessary arrangements for the cargo, decided in what compartments of the ship the principal cargo should be loaded—though leaving the rest of the loading plan to the captain of the vessel—and ordered the shipwright contractor to fit up the ship in accordance with the rules and the loading plan. In that part of his duties connected with the shipwright work the agent had the aid of his assistants, his marine superintendent, the captain of the vessel, and the wharf officials.

After the petitioner was incorporated the duties of each of the three men, now both agents and stockholders, were the same as before except that now, upon completion of the work, the agent can inspect the books of the shipwright company and check the bill.

Edward Nathan supervised the petitioner's clerical work and looked after the details of its business. He had under him a chief clerk and a bookkeeper.

The petitioner secured a " very good " superintendent, formerly the foreman for the contractor above mentioned. This man had his son as an assistant and, after they had been informed as to the plan for loading a particular vessel, they hired all labor and ordered all necessary material for the work at a fixed price, prearranged between the seller and the petitioner. By doing all of the shipwright work for the three lines the petitioner was able to purchase lumber and supplies at low prices.

Materials needed in connection with the shipwright work on a particular steamer were delivered by the seller at the wharf where the steamer was docked. They were charged to the account of the petitioner and bills therefor were rendered at the end of each month. The petitioner's foreman or the captain of the vessel signed a receipt for the seller on delivery of the materials at the wharf. The work on a steamer was usually completed within two days. In 1918, the petitioner's biggest year, over 300 vessels were fitted. Much of the

work was done at night. When the work for a particular steamer was completed, the agent of the steamship company owning the vessel was presented with a bill setting forth the cost of the materials and labor, charge for the superintendent's services, workmen's compensation insurance, miscellaneous expenses, and a charge to include the petitioner's overhead expenses, plus 10 or 15 per cent of the total. A typical bill included charges as follows:

| | |
|---|---:|
| Material | $2, 166. 18 |
| Labor | 1, 699. 24 |
| Superintendent | 15. 00 |
| Miscellaneous | 5. 00 |
| Workmen's compensation insurance | 110. 55 |
| Fifteen per cent of the above | 599. 40 |
| Total | 4, 595. 37 |

After the bill had been approved by the captain, the agent for the steamship company, within from three to five days of the completion of the work, paid the petitioner the amount of the bill.

When more materials were ordered for a vessel than were necessary, the excess remained on the wharf of that particular steamship company and was used in the next steamship of the same line loading at that wharf. The petitioner never sold any materials which it purchased for shipwright work and it seldom did any shipwright work upon any steamships except those owned by the Harrison Lines, the Leyland Lines and the Elder-Dempster Lines.

The petitioner sometimes had as many as 100 carpenters and laborers in its employ. These men were hired by the job and were paid by the hour or quarter day during actual employment. Payrolls sometimes averaged $40,000 a month. If in any case the petitioner did not have cash on hand to meet a payroll, the agents of the steamship companies were requested to and did advance their proportionate shares.

None of the stockholders ever received any salary for services, but Edward Nathan, as secretary, treasurer and manager, was paid bonuses over the proportionate amount of earnings to which his shares entitled him, for direct supervision of all services performed, as follows:

| | |
|---|---:|
| In 1918 | $765. 00 |
| In 1919 | 4, 103. 78 |
| In 1920 | 306. 00 |
| In 1921 | 789. 56 |

The respective balance sheets of the petitioner for December 31 in each of the years 1917, 1918, 1919, 1920, and 1921, show:

|  | Dec. 31, 1917. | Dec. 31, 1918. | Dec. 31, 1919. | Dec. 31, 1920. | Dec. 31, 1921. |
|---|---|---|---|---|---|
| **ASSETS.** |  |  |  |  |  |
| Liberty loan bonds | $24,413.20 | $44,413.20 | | | $14,869.40 |
| Accounts receivable (trade) | 2,100.99 | 26,075.01 | $9,240.54 | $4,553.91 | 5,970.39 |
| Loans (stockholder) | | 6,000.00 | | 1,200.00 | 2,462.17 |
| Lumber on hand (account steamers) | 1,247.90 | 2,017.78 | 2,652.00 | 4,001.10 | 850.55 |
| Furniture and fixtures | | | | 175.12 | 189.46 |
| Automobile | | | | 305.16 | 1,178.06 |
| Accrued interest (Liberty bonds) | | | | | 82.56 |
| Motor deposit | | | | | 5.00 |
| Cash | 14,161.38 | 1,999.31 | 2,334.76 | 18,697.74 | 4,917.09 |
| Totals | 41,923.47 | 80,505.30 | 14,227.30 | 28,933.03 | 30,524.68 |
| **LIABILITIES.** |  |  |  |  |  |
| Capital stock | 5,100.00 | 5,100.00 | 5,100.00 | 5,100.00 | 5,100.00 |
| Bills payable (Liberty bonds) | | 10,000.00 | | | |
| Accounts payable (trade) | 618.04 | 16,760.57 | 6,494.95 | 168.22 | 1,154.15 |
| Surplus | 36,205.43 | 48,644.73 | 2,632.35 | 23,664.81 | 24,270.53 |
| Totals | 41,923.47 | 80,505.30 | 14,227.30 | 28,933.03 | 30,524.68 |

The accounts payable represent supplies received, bills for which were not due. The principal amount under accounts receivable was for work in process of completion on the day on which the balance was taken, the bill for which had not been rendered to the agent for the steamship company. The petitioner's overhead expenses consisted of salaries of office clerks, employers' liability insurance, automobile expenses, office rent, advertising for help, audit fees, telephone and telegraph, and other miscellaneous items. These overhead expenses amounted to $4,599.60 in 1918, $12,275.39 in 1919, $6,939.02 in 1920, and $6,708.56 in 1921. The gross value of materials, supplies and labor amounted to $445,308.24 in 1918, $127,326.47 in 1920, and $89,063.38 in 1921. The net profits were for 1918, $37,939.30, for 1919, $4.44, for 1920, $31,440.93, and for 1921, $26,936.24. Dividends were usually paid every six months. The corporation paid dividends amounting to $25,500 in 1918 and $58,353.60 in 1919.

In addition to his activities in the conduct of the affairs of the petitioner for the years 1918 to 1921, inclusive, Alfred LeBlanc received a salary of $5,000 and a commission of 2½ per cent on the steamer freight list for acting as the New Orleans agent of the Harrison Lines, a commission of 2½ per cent on light freight and 1¼ per cent on coffee, for acting as the New Orleans agent of the Lamport and Holt Lines, and also commissions for acting as the New Orleans agent of Chubb & Sons. He also received a salary from LeBlanc & Bailey, Ltd., a fire and marine insurance company, in which he owned a one-half interest and to which he devoted some of his time.

M. J. Sanders received a salary of $12,000 or $15,000 a year during the years 1918 to 1921, inclusive, for acting as the New Orleans agent of the Leyland Lines. About 1918, he organized the Mis-

sissippi Shipping Company Corporation and devoted some time to this company until about the year 1921. He also devoted some time to Mobile Liners, Inc., of which he was the president.

Edward Nathan was an expert freight broker and a partner in Nathan & Fettis.

No part of the petitioner's gross or net income consisted of gains, profits, or income derived from trading as a principal, nor of gains, profits, commissions or other income derived from a Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive.

OPINION.

MURDOCK: A personal service corporation is one " whose income is to be ascribed primarily to the activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether invested or borrowed) is not a material income-producing factor," and which meets certain other requirements of the statute. The obvious intent of Congress was to exempt those corporations from taxation as corporations whose profits were due primarily to personal service rendered by the principal owners or stockholders, provided they meet all of the other requirements of the definition in section 200 of the Revenue Acts. Do the facts in this case qualify the petitioner for personal service classification?

This corporation had a very small amount of capital and, so far as the record discloses, it never borrowed any money on its paper. But it retained a considerable surplus in the business; materials and supplies were purchased on credit, and the steamship lines occasionally advanced money for payrolls. We must consider these things when we are called upon to decide whether capital, invested or borrowed, was a material income-producing factor.

R. A. Warriner, who owned one-sixth of the stock, gave none of his time to the conduct of the corporation's affairs. The other stockholders were somewhat active in the business. They chose an able superintendent and they may have had a part in obtaining good workmen and favorable prices for supplies and in seeing that the books were properly kept, but aside from these things, which are not determinative, there was no satisfactory evidence to show, and we are unable to see, just what LeBlanc, Sanders, and Matthew Warriner did as stockholders, from which we might decide that they were regularly engaged in the active conduct of the affairs of the corporation.

LeBlanc testified that he directed the shipwright work on the Harrison Line steamers, that Sanders did the same for the Leyland

Line vessels and that Matthew Warriner performed a like service for the Elder-Dempster Line boats. But he did not tell us in what way he directed this work and he failed to mention any new duties which he took on as a stockholder which he did not already have as agent. He said that the shipwright work which he did as stockholder he would have done in any event as agent—that he could not separate the one from the other. He also said that after the plan for loading a vessel had been adopted it was only necessary to tell the foreman to fit up the boat in conformity with the rules. We fail to see any personal element in this service.

Sanders' testimony was to the same effect. It indicated that a large part of his work was done by assistants and that he personally might not go to the wharf once in a month. He said that his duties before and after the petitioner was incorporated differed very little.

A corporation, to qualify for personal service classification, must prove that its income is to be ascribed primarily to the activities of its principal stockholders. In the present case the ability and judgment of four of the stockholders undoubtedly played a part in the production of the petitioner's income, but in respect to the activities of three of these men the evidence leaves us in doubt, as we have already indicated.

Demand for the petitioner's services arose because the agents for three important steamship lines were numbered among its stockholders. The same situation was favorable to the success of the petitioner in other ways. For instance, because of it, bills were promptly paid and bad debts were avoided. As a result of the large volume of business which came to the petitioner from these three steamship lines, it could obtain favorable prices for lumber and supplies and could maintain a permanent force both for superintendence and for clerical work. See *Appeal of Medbury-Wilson Co.*, 1 B. T. A. 963; and *Appeal of Citizens Underwriters Agency*, 2 B. T. A. 1116.

The petitioner received income because it was able to furnish completed shipwright work, satisfactory in workmanship and price. Before selling this finished product it took some of the risks of a manufacturer. Fire, accident, or negligence might have caused a loss to the petitioner. It was paid for taking this chance and some of the income must be ascribed to its acceptance of these risks.

We have carefully considered not only the facts above discussed, but also all other facts in this case; we have had in mind that failure to meet any one of the tests of the definition is fatal to the contention of the petitioner, and we are of the opinion that the

petitioner, during the years in question, was not a personal service corporation as defined by section 200 of the Revenue Acts of 1918 and 1921.

> *Judgment will be entered for the Commissioner.*